UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:23-cv-03934-MCS-JC | Date | August 28, 2023 |
| Title | *BNSF Ry. Co. v. Float Alaska IP, LLC* | | |

Present: The Honorable   Mark C. Scarsi, United States District Judge

| Stephen Montes Kerr | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:** (IN CHAMBERS) ORDER RE: MOTION FOR PRELIMINARY INJUNCTION (ECF NO. 65)

Plaintiff BNSF Railway Company moves for a preliminary injunction enjoining Defendant Float Alaska IP, LLC from using the "Northern Pacific" marks in connection with its commercial airline business. (Notice of Mot., ECF No. 65; Mot., ECF No. 65-1.) Float Alaska opposes the motion, and BNSF filed a reply. (Opp'n, ECF No. 70; Reply, ECF No. 71.) The Court heard argument on August 14, 2023. (Mins., ECF No. 78.)

I.   **BACKGROUND**

According to the first amended complaint, BNSF is a railroad company, "operat[ing] one of the largest railroad networks in North America, covering the western two-thirds of the United States." (FAC ¶ 7, ECF No. 57.) Through its predecessor entities, BNSF has provided railway transportation services under the Northern Pacific name "since at least as early as 1893." (*Id.* ¶ 10.) BNSF, the entity surviving a series of mergers, owns the trademarks with the following U.S. Registration numbers: 3,421,163; 3,421,164; and 5,007,556 (the "Northern Pacific

Marks"). (*Id.* ¶¶ 11, 13.) These marks are duly registered as incontestable. (*Id.* ¶ 13; Schwartz Decl. Exs. 48–50.)[1]

Float Alaska is the corporate entity that operates Northern Pacific Airways, a start-up commercial airline. (FAC ¶¶ 3, 19, 25.) Float Alaska sought to register with the U.S. Patent & Trademark Office (the "USPTO") the service marks Northern Pacific, Northern Pacific Airlines, Northern Pacific Airways, NP, and NPA, but the USPTO rejected the marks due to "a likelihood of confusion with" BNSF's registrations. (*Id.* ¶¶ 21, 23; Am. Answer & Countercls. 20, ECF No. 69.) As a result of the examiner's final rejections, Float Alaska petitioned for cancellation of BNSF's marks, alleging abandonment and fraud. (FAC ¶ 24.) Float Alaska proceeded to market its commercial airline services under the Northern Pacific name, offering service between Ontario, California and Las Vegas, Nevada beginning June 23, 2023, with plans to expand into other regions, including Asia. (*Id.* ¶¶ 20, 26; Am. Answer & Countercls. 20.)

BNSF asserts seven claims against Float Alaska: (1) trademark infringement in violation of 15 U.S.C. § 1114(1); (2) unfair competition, false designation of origin, and false descriptions in violation of 15 U.S.C. § 1125(a); (3) cancellation of Float Alaska's Northern Pacific applications before the USPTO; (4) fraudulent application before the USPTO; (5) trademark infringement in violation of California Business and Professions Code section 14245; (6) common law trademark infringement; and (7) unfair competition in violation of California Business and Professions Code section 17200. (*Id.* ¶¶ 27–71.)

In its responsive pleading, Float Alaska brings four counterclaims against BNSF: (1) declaratory judgment of abandonment; (2) fraudulent application before the USPTO; (3) unfair competition in violation of California Business and Professions Code section 17200; and (4) cancellation of BNSF's trademark registrations. (Am. Answer & Countercls. 28–34.)

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 65(a)(1), a "court may issue a preliminary injunction only on notice to the adverse party." "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res.*

---

[1] In support of this motion, BNSF proffered Exhibits 1 to 50 to the Schwartz Declaration, which are filed under ECF numbers 65-5 to 65-54, respectively.

*Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A party seeking a preliminary injunction can obtain one by showing that "(1) it is 'likely to succeed on the merits,' (2) it is 'likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in [its] favor,' and (4) 'an injunction would be in the public interest.'" *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (alteration in original) (quoting *Winter*, 555 U.S. at 20). The Ninth Circuit also employs a sliding scale approach under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

### III. DISCUSSION

#### A. Likelihood of Success on the Merits

BNSF indicates that "[t]he primary thrust of [its] suit concerns trademark infringement under the Lanham Act." (Mot. 6.) Although BNSF does bring additional claims congruent with the federal trademark claim, (FAC ¶¶ 56–71), the Court understands the motion as seeking a preliminary injunction on BNSF's purported likelihood of succeeding on its Lanham Act claim, (Mot. 6–17 (addressing authorities on federal trademark infringement)).

"To establish infringement of a registered trademark, the trademark holder must show that it is (1) the owner of a valid, protectable mark, and (2) that the alleged infringer is using a confusingly similar mark." *Grocery Outlet Inc. v. Albertson's Inc.*, 497 F.3d 949, 951 (9th Cir. 2007) (citing 15 U.S.C. § 1114(1) and *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999)).

##### 1. Valid, Protectable Mark

As to the first prong of a trademark infringement claim, BNSF has proffered declarations of use and incontestability of the Northern Pacific Marks, (Schwartz Decl. Exs. 48–50), which are "*conclusive* evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce," 15 U.S.C. § 1115(b) (emphasis added). Given its incontestable marks, BNSF has demonstrated a likelihood of proving it owns valid, protectable marks. Thus, it is incumbent on Float Alaska to demonstrate a likelihood of succeeding on one of its

affirmative defenses. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007) ("[O]nce the moving party has carried its burden of showing a likelihood of success on the merits, the burden shifts to the non-moving party to show a likelihood that its affirmative defense will succeed.").

Float Alaska challenges the validity of BNSF's registrations, arguing in its answer and in opposition to the present motion that BNSF fraudulently obtained the Northern Pacific Marks and has since abandoned the marks. (Am. Answer & Countercls. 13–17; Opp'n 11–17.) BNSF addresses both arguments in defense of its marks. As to abandonment, BNSF contends that it uses the Northern Pacific Marks as part of its "heritage marketing" strategy, proffering several documents demonstrating its use of the marks on various heritage train cars, its website, and several informational articles. (Mot. 7–10 (citing, inter alia, Schwartz Decl. Exs. 11–14, 34–37).) And as to fraud, BNSF maintains that Float Alaska cannot prove fraud, (*id.* at 10), highlighting the lack of any factual support, (Reply 4–5).

        a.    *Fraud*

A party may seek cancellation of a registered trademark on the basis of fraud under 15 U.S.C. § 1064(3) by proving: "(1) a false representation regarding a material fact; (2) the registrant's knowledge or belief that the representation is false; (3) the registrant's intent to induce reliance upon the misrepresentation; (4) actual, reasonable reliance on the misrepresentation; and (5) damages proximately caused by that reliance." *Hokto Kinoko Co. v. Concord Farms, Inc.*, 738 F.3d 1085, 1097 (9th Cir. 2013); *see also* 15 U.S.C. § 1119 ("In any action involving a registered mark the court may . . . order the cancelation of registrations . . . ."). "[F]iling a fraudulent incontestability affidavit provides a basis for canceling the registration itself," *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1444 (9th Cir. 1990), so long as each element of fraud is met, *Hokto Kinoko*, 738 F.3d at 1097. The proponent of fraud "bears a heavy burden of demonstrating that a trademark should be cancelled." *Id.*

Starting with Float Alaska's claim of fraud, the Court finds that the evidence proffered fails to demonstrate a likelihood of succeeding on the fraud affirmative defense. Float Alaska rests its entire fraud argument on its affirmative defense and counterclaim responsive pleading. (Opp'n 17.) The pleading itself offers conclusory allegations "upon information and belief" without alleging specific facts supporting Float Alaska's claim. (Am. Answer & Countercls. 17, 30–33.) The sole factual support for the fraud claim is "that the specimen filed in connection with the

Combined Declaration of Use and Incontestability under Sections 8 & 15 for the [']556 Registration, filed on July 11, 2022, depicts a locomotive, located indoors, and not positioned on a rail track." (*Id.* at 31.) Yet this lone fact is insufficient at this stage to meet the "heavy burden of demonstrating" fraud. *Hokto Kinoko*, 738 F.3d 1097. Even assuming arguendo that displaying an indoor train car in BNSF's declaration of use and incontestability constitutes a misrepresentation, Float Alaska alleges no factual support for an intent to mislead the USPTO. (Am. Answer & Countercls. 31–32.) Thus, the Court finds that Float Alaska's fraud counterclaim as alleged is insufficient to cast doubt on the validity of BNSF's marks for purposes of adjudicating this motion.

          b.     *Abandonment*

Abandonment is a defense to a claim of infringement of a registered trademark. 15 U.S.C. § 1115(b)(2). A trademark may be abandoned in two ways: (1) nonuse, or (2) the mark becoming generic. *Id.* § 1127. To prove abandonment by nonuse, a defendant must strictly prove: "(1) discontinuance of trademark use *and* (2) intent not to resume such use." *Electro Source, LLC v. Brandess-Kalt-Aetna Grp., Inc.*, 458 F.3d 931, 935 (9th Cir. 2006); *see Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp. of Cal.*, 694 F.2d 1150, 1156 (9th Cir. 1982). "[T]he standard for non-use is high. Non-use requires '*complete* cessation or discontinuance of trademark use,' where 'use' signifies any use in commerce." *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1247–48 (9th Cir. 2013) (quoting *Electro Source*, 458 F.3d at 936, 938). A service mark is used in commerce "when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State . . . and the person rendering the services is engaged in commerce in connection with the services." 15 U.S.C. § 1127. Put simply, "the 'use in commerce' requirement includes (1) an element of actual use, and (2) an element of display." *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1159 (9th Cir. 2001).

To determine whether a registrant's mark is used in commerce, courts employ a totality of the circumstances approach, considering:
> the genuineness and commercial character of the activity, the determination of whether the mark was sufficiently public to identify or distinguish the marked service in an appropriate segment of the public mind as those of the holder of the mark, the scope of the non-sales activity relative to what would be a commercially reasonable

> attempt to market the service, the degree of ongoing activity of the holder to conduct the business using the mark, the amount of business transacted, and other similar factors which might distinguish whether a service has actually been "rendered in commerce."

*Id.*; *see also GeoData Sys. Mgmt., Inc. v. Am. Pac. Plastic Fabricators, Inc.*, No. CV 15-4125-VAP (JEMx), 2016 WL 11756835, at *9–11 (C.D. Cal. Oct. 19, 2016) (applying the *Chance* factors to the defendant's abandonment defense). "Even a single instance of use is sufficient against a claim of abandonment of a mark if such use is made in good faith." *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 804 (9th Cir. 1970).

In its opposition, Float Alaska asserts four theories of abandonment. First, BNSF is only using its marks "in a colloquial sense, to reserve its rights in the same and/or to maintain its heritage." (Opp'n 13 (citing, inter alia, FAC ¶ 32 (stating that BNSF "intends to reserve and maintain rights" in the Northern Pacific Marks)).) Second, by failing to allege use of the marks in connection with its services, BNSF has admitted abandonment. (*Id.*) Third, the evidence BNSF proffered in support of its motion fails to demonstrate use in interstate commerce. (*Id.* at 13–14.) Fourth, evidence cited in its counterclaim demonstrates that BNSF is not using the Northern Pacific Marks in commerce. (*Id.* at 14.) The Court considers and rejects each of Float Alaska's arguments.

Starting with Float Alaska's admission-by-omission argument, a plaintiff need not address affirmative defenses at the pleading stage, *see U.S. Commodity Futures Trading Comm'n v. Monex Credit Co.*, 931 F.3d 966, 972 (9th Cir. 2019), and the Ninth Circuit has repeatedly described abandonment as an affirmative defense to trademark infringement, *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1072 (9th Cir. 2014); *Herb Reed*, 736 F.3d at 1247. And even if "[a]llegations in a complaint are considered judicial admissions," *Hakopian v. Mukasey*, 551 F.3d 843, 846 (9th Cir. 2008), it does not follow that the absence of an allegation constitutes any binding judicial admission. Otherwise, a plaintiff would be required to plead every possible factual contingency lest it lose its ability to raise additional arguments after the benefit of fact discovery. But, unless a heightened standard applies, all that is required is a short and plain statement of the claim providing the defendant with fair notice of what the claim is and the grounds upon which it rests. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To the extent BNSF is required to plead use in commerce in its case-in-chief, *see Kythera Biopharms., Inc. v. Lithera, Inc.*, 998 F. Supp. 2d 890, 898–901 (C.D. Cal. 2014)

(considering a Rule 12(b)(6) challenge against the plaintiff's "use in commerce" allegations), the remedy for failing to adequately allege an element of a claim is dismissal, not a finding that the plaintiff admits it is unable to prove that missing element. The Court thus declines to find an admission of nonuse by BNSF in its first amended complaint.

As to the first, third, and fourth theories of abandonment,[2] BNSF proffers three hopper cars and two locomotives bearing the Northern Pacific Marks, (Mot. 9–10 (citing, inter alia, Schwartz Decl. Exs. 18–22, 25)), and train logs demonstrating the five train cars' extensive interstate movement since 2013,[3] (Schwartz Decl. Exs. 23, 25, 35–37). BNSF also points to the Northern Pacific Marks emblazoned on railroad bridges, (Schwartz Decl. Ex. 17), informational articles, (Schwartz Decl. Ex. 11), its website, (Schwartz Decl. Ex. 2), and in a museum honoring its Northern Pacific heritage, (Schwartz Decl. Ex. 5). At the hearing, Float Alaska focused on the heritage train cars, arguing that this use of the Northern Pacific Marks is merely ornamental because BNSF does not sell freight transportation services under the Northern Pacific Marks, only under the BNSF name. Further, Float Alaska maintained that BNSF does not sell any services under the Northern Pacific Marks, i.e., a prospective consumer cannot go to the BNSF website and purchase freight services with these Northern Pacific heritage train cars specifically, which fails to prove use in commerce.

The Court finds that Float Alaska has not demonstrated a likelihood of succeeding on its affirmative defense of abandonment because Float Alaska has failed to demonstrate a likelihood of prevailing on the "highly fact-specific 'totality of the circumstances' inquiry," *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1208 (9th Cir. 2012) (considering use in commerce in the summary judgment context), particularly given the lack of any analysis of the *Chance* factors, (*see*

---

[2] The Court understands these arguments as all challenging the sufficiency of BNSF's proffer of evidence supporting bona fide uses in commerce.

[3] While BNSF also proffers the train logs of nine additional anniversary locomotives, (Schwartz Decl. Ex. 23 (locomotive numbers 6111, 6163, and 6179); Schwartz Decl. Ex. 24 (locomotive numbers 5828, 5869, 5872, 6017, 6022, and 6075)), BNSF failed to provide any additional, corroborating evidence—for example, photographs—demonstrating that these locomotives bear the Northern Pacific Marks. Accordingly, the Court only considers the sufficiency of the five train cars (numbers 485609, 486315, 478793, 6078, and 6026) for which BNSF has proffered evidence of use of the mark.

*generally* Opp'n). Whatever gloss Float Alaska puts on BNSF's use of the Northern Pacific Marks, BNSF appears to have demonstrated at this early stage (1) an element of actual use, (Schwartz Decl. Exs. 18–22, 25), and (2) an element of display, (Schwartz Decl. Exs. 2, 11, 27), both in connection with their interstate freight transportation business, *Chance*, 242 F.3d at 1159; 15 U.S.C. § 1127. While Float Alaska contends that BNSF must sell services in connection with the Northern Pacific Marks, "evidence of actual sales, or lack thereof, is not dispositive in determining whether a party has established 'use in commerce' within the meaning of the Lanham Act." *Rearden*, 683 F.3d at 1205.

Float Alaska offers little else from which to conclude that none of BNSF's uses of the Northern Pacific Marks constitute use in commerce. As to the first abandonment argument, (Opp'n 13), BNSF's allegations in paragraph 32 of the first amended complaint are simply boilerplate reservations of an exclusive right to use the Northern Pacific Marks. These allegations are neither here nor there, as Float Alaska could just as well weaponize the absence thereof to argue that BNSF does not intend to reuse the Northern Pacific Marks. As to the third abandonment argument, (*id.* at 13–14), Float Alaska failed to raise these allegations in its corresponding affirmative defense or counterclaim, (Am. Answer & Countercls. 13, 28–30), which casts doubt on Float Alaska's ability to use its fraud allegations in support of its abandonment defense. In any event, the third argument misses the point because BNSF has proffered additional evidence of hopper and locomotive train cars in active, interstate service. (Schwartz Decl. Exs. 23, 25, 35–37.) And as to the fourth argument, again, Float Alaska fails to overcome the evidence presented. That BNSF train number 3617 has not been in continuous service and that a Facebook group considers the Northern Pacific Railway "gone," (Am. Answer & Countercls. 22 (internal quotation marks omitted)), are nonresponsive to the evidence proffered in BNSF's motion. There remain at least five in-service train cars bearing the Northern Pacific Marks. Given the lack of any meaningful analysis under *Chance*, the Court finds that Float Alaska has failed to demonstrate a likelihood of succeeding on the abandonment defense.

In sum, BNSF has proven a likelihood of owning a valid, protectable mark.

2.      Likelihood of Consumer Confusion

The second prong of a trademark infringement claim requires showing "the alleged infringer is using a confusingly similar mark." *Grocery Outlet Inc*, 497 F.3d

at 951 (citing 15 U.S.C. § 1114(1), and *Brookfield Commc'ns, Inc.*, 174 F.3d at 1046). Courts weigh nine factors to determine the likelihood of confusion:

>   1. strength of the mark; 2. proximity of the goods;
>   3. similarity of the marks; 4. evidence of actual confusion;
>   5. marketing channels used; 6. type of goods and the degree of care likely to be exercised by the purchaser;
>   7. defendant's intent in selecting the mark; and
>   8. likelihood of expansion of the product lines.

*AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979). "The *Sleekcraft* factors are intended as an adaptable proxy for consumer confusion, not a rote checklist." *Network Automation, Inc. v. Advanced Sys. Concepts. Inc.*, 638 F.3d 1137, 1145 (9th Cir. 2011).

   a.   *Strength of the Mark*

"The strength of a mark is determined by the mark's conceptual distinctiveness and its commercial strength." *JOL Mgmt. Co. v. Polycell Nutraceuticals, Inc.*, No. CV 08-198 ABC (FFMx), 2008 WL 11334472, at *2 (C.D. Cal. Aug. 18, 2008) (citing *GoTo.com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1207 (9th Cir. 2000)).

Both parties agree that the Northern Pacific Marks are at least suggestive, (Mot. 11–12; Opp'n 18), and the Court agrees. Even if Northern Pacific may have been descriptive for the predecessor, Northern Pacific Railway, (Schwartz Ex. 6, at 9, 12 (showing that the Northern Pacific Railway lines ran from Lake Superior to the Pacific Northwest region)), today, the marks are likely suggestive because BNSF operates an extensive interregional network, including with its heritage hoppers and locomotives, (*see, e.g.*, Schwartz Ex. 35, at 131 (showing cross-country travel outside of the northern Pacific region, including Texas, Oklahoma, Kansas, and Missouri)).[4] And given the "millions of dollars in advertising . . . the Northern Pacific [M]arks," (Kent Decl. ¶ 10, ECF No. 65-2), the Court also agrees that additional protection for these suggestive marks is warranted,[5] *see Pom Wonderful*

---

[4] Pinpoint citations of Exhibit 35 of the Schwartz Declaration refer to the page numbers in the CM/ECF header.

[5] The Court also notes that Float Alaska does not contest BNSF's *Pom* argument, which is a concession of its merit. *See John-Charles v. California*, 646 F.3d 1243, 1247 n.4 (9th Cir. 2011) (deeming issue waived where party "failed to develop any argument"); *City of Arcadia v. EPA*, 265 F. Supp. 2d 1142, 1154 n.16 (N.D. Cal.

*LLC v. Hubbard*, 775 F.3d 1118, 1126 (9th Cir. 2014). The Court finds that the Northern Pacific Marks are sufficiently strong for this *Sleekcraft* factor to favor BNSF.

          b.        *Proximity and Relatedness of the Services*

Services are proximate if consumers are "likely to associate" the two service lines. *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 633 (9th Cir. 2005). Courts "consider whether the buying public could reasonably conclude that the products came from the same source." *Id.*

On the one hand, BNSF and Float Alaska offer materially different services. BNSF is largely a freight transportation railroad company, whereas Float Alaska is a commercial airliner carrying traveling passengers. Indeed, both companies are in the transportation industry, but the similarities are limited. BNSF argues that its drone and other aircraft operations are proximate to Float Alaska's business, as both operations are "aviation-related," (Mot. 13 (emphasis omitted)), but any aircraft use is intended to monitor railyards and other assets, not to transport people or things, (*id.* at 14 (citing issued and pending patents for automated drone-based surveillance)).

On the other hand, as the USPTO acknowledged in its denial of Float Alaska's applications for trademark registration, many companies have offered airline and rail freight transportations services under the same mark. (Schwartz Decl. Ex. 9, at 4–5.)[6] Beyond rail and commercial aviation, it is not uncommon for a transportation company to expand into other modes of transportation, *see, e.g.*, *Virgin Enters., Ltd. v. Virgin Petroleum, Inc.*, No. CV 99-12826 MMM (MANx), 2000 U.S. Dist. LEXIS 8100, at *27–28 (C.D. Cal. Jan. 19, 2000), examples of which increase the likelihood of consumers mistakenly believing that the senior user of the Northern Pacific Marks has expanded into commercial aviation. Particularly given Float Alaska's significant California presence, (Am. Answer & Countercls. 4), and BNSF's operation of the Southern California commuter rail network, Metrolink, (Schwartz Decl. Ex. 26), there is a likelihood that consumers may confuse Float Alaska's use of the Northern Pacific Marks with BNSF's.

---

2003) ("[T]he implication of this lack of response is that any opposition to this argument is waived.").

[6] Pinpoint citations of Exhibit 9 of the Schwartz Declaration refer to the page numbers in the CM/ECF header.

Taking these facts together, the Court finds that the proximity and relatedness factor is neutral to the likelihood of confusion analysis. Even though companies have, in the past, operated both rail and air transportation, those companies maintained consistent branding, leaving little doubt as to the owner of those marks. (Schwartz Decl. Ex. 9, at 4–5.) Here, BNSF uses the Northern Pacific Marks in a limited capacity and has proffered evidence of only five train cars presumably out of thousands of other train cars that bear only the BNSF mark. (Schwartz Decl. Exs. 23, 25, 35–37.) Both parties offer reasonable arguments why a consumer may confuse the marks or be alert to the differences. Thus, this factor is neutral.

        c.        *Similarity of the Marks*

"Similarity of the marks is tested on three levels: sight, sound, and meaning." *Sleekcraft*, 599 F.2d at 351.

Whether under sight, sound, and meaning, the marks are identical, both using the term "Northern Pacific." (*Compare* Schwartz Decl. Ex. 1, *with* Schwartz Decl. Ex. 12.) While Float Alaska contends that the subject marks must be viewed "in light of the way the marks are encountered in the marketplace and the circumstances surrounding their purchase," (Opp'n 20 (citing *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 725 F.2d 1240, 1245 (9th Cir. 1984)); *see also Walt Disney Prods. v. Air Pirates*, 581 F.2d 751, 759 (9th Cir. 1978), the Court nonetheless concludes that the marks are sufficiently similar to tip the balance toward a likelihood of consumer confusion. Even if there are differences in the industries BNSF and Float Alaska occupy, the differences in marketplace contexts are insufficient to render these otherwise identical trademarks dissimilar for purposes of the *Sleekcraft* analysis. As discussed in the proximity and relatedness factor, there is a long-established nexus between the airline and railroad industries, even if the modes of transportation are different. (Schwartz Decl. Ex. 9, at 4–5.) In other words, while placement of the Northern Pacific Marks on a train and aircraft are different marketplace contexts, there is nonetheless a likelihood of consumer confusion because consumers likely have encountered companies offering both rail and airline services in the past. Thus, because the marks are identical, this factor weighs in favor of a likelihood of confusion.

d. *Evidence of Actual Confusion*

As to evidence of actual confusion, both BNSF and Float Alaska argue that the absence of any such evidence renders this factor neutral. (Mot. 11, 16; Opp'n 21.) The Court agrees and finds that the lack of any evidence of actual confusion at this early stage favors neither BNSF nor Float Alaska. *Pom*, 775 F.3d at 1131. This factor is neutral.

e. *Marketing Channels*

"Convergent marketing channels increase the likelihood of confusion." *Sleekcraft*, 599 F.2d at 353. "In assessing marketing channel convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products." *Pom*, 775 F.3d at 1130. To that end, courts look at "the locations where the goods were sold, the price range of the goods, and the types of advertising used." *Moroccanoil, Inc. v. Zotos Int'l, Inc.*, 230 F. Supp. 3d 1161, 1175 (C.D. Cal. 2017) (citing *Sleekcraft*, 599 F.2d at 353).

The Court finds that the marketing channels factor is neutral to the analysis. Even assuming arguendo that BNSF does not market services under the Northern Pacific Marks, (Opp'n 21), consumers can nonetheless find BNSF's Northern Pacific-related promotional and heritage material online, where BNSF markets its freight transportation services, (Mot. 17; Schwartz Decl. Exs. 2–3, 5–6), and Float Alaska displays its use of the Northern Pacific name, (Schwartz Decl. Ex. 29). However, "[t]he fact that both parties sell products online adds little weight in the overall likelihood of confusion analysis." *Moroccanoil, Inc.*, 230 F. Supp. 3d at 1176. Given the lack of further argument, the Court finds that this factor is neutral.

f. *Type of Services and Degree of Care Likely to be Exercised by the Purchaser*

The Ninth Circuit has acknowledged that "the default degree of consumer care is becoming more heightened as the novelty of the Internet evaporates and online commerce becomes commonplace." *Network Automation*, 638 F.3d at 1152. In any event, courts "expect consumers to be 'more discerning' and 'less easily confused' when purchasing expensive goods." *Hokto Kinoko*, 738 F.3d at 1096.

BNSF offers no genuine argument for the contention that "this factor does not weigh in favor of either party," (Mot. 17 (internal quotation marks omitted)) and fails

to carry its burden of persuasion. In any event, the Court finds on the merits that consumers of freight transportation and commercial airline travel are likely to be more discerning given the high price point for obtaining these specialized services. Further, commercial airline travelers are likely to be especially discerning of quality of service and safety, *New Flyer Indus. Can. ULC v. Rugby Aviation, LLC*, 405 F. Supp. 3d 886, 903 (W.D. Wash. 2019), among other factors like timing and convenience.[7] And as to commercial freight transportation, consumers of which are likely businesses moving significant quantities of goods, consumers are all likewise discerning given the very specific services required. (Opp'n 22.) Accordingly, the Court finds that this factor weighs against a likelihood of confusion.

g. *Defendant's Intent in Selecting the Mark*

"When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Sleekcraft*, 599 F.2d at 354.

The Court applies the presumption of intent to deceive the public, which Float Alaska fails to rebut. Float Alaska adopted its version of the Northern Pacific Marks despite constructive notice of BNSF's trademark registrations since at least 2008 and actual notice of BNSF's rights in the Northern Pacific Marks since 2021, when the USPTO rejected Float Alaska's applications to register under the Northern Pacific name. (Schwartz Decl. Exs. 1, 9.) Further, BNSF rejected Float Alaska's request for consent to use the Northern Pacific Marks shortly before the start of litigation. (Richmond Decl. Ex. D, ECF No. 70-3.) Despite clear notice of BNSF's rights to the marks, Float Alaska adopted the Northern Pacific Marks. In opposition, Float Alaska simply argues that the burden is BNSF's to prove Float Alaska's intent. (Opp'n 22.) This is insufficient to rebut the presumption of malintent. Thus, this factor weighs in favor of a likelihood of confusion.

h. *Likelihood of Expansion of the Service Lines*

"A strong possibility that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Sleekcraft*, 599 F.2d at 354 (cleaned up). However, "evidence . . . of product

---

[7] For example, few among us would needlessly select a flight with a layover or arrive at a destination at 3:00 a.m., supporting the discerning nature of airline passengers.

expansion is not required for a finding of likelihood of confusion." *Pom*, 775 F.3d at 1131.

This factor is neutral at this stage. BNSF argues that it "has already expanded into the FAA regulated environment with its extensive array of drones and related patented technologies," but this foray into aviation is not transport of any goods or passengers. (Mot. 17.) Float Alaska "does not have any plans to expand its services to include railroad transportation." (Opp'n 22 (citing Hsieh Decl. ¶ 5, ECF No. 70-1).) Even though BNSF has not demonstrated a strong possibility of either company expanding into the other's service lines, i.e., passenger airline and rail freight transportation, "[t]he absence of any proof regarding . . . product expansion does not affect [the Court's] likelihood-of-confusion analysis." *Pom*, 775 F.3d at 1131. This factor is neutral.

i. *Totality of the Factors*

In sum, only one factor decreases the likelihood of confusion: the degree of care by the purchaser. Four factors are neutral: proximity of services, actual confusion, marketing channels, and expansion of services lines, though the Court need not find evidence of actual confusion or a likelihood of expansion to find a likelihood of confusion. *Id.* The other three factors increase the likelihood of confusion: strength of the mark, similarity of the marks, and Float Alaska's intent in adopting the Northern Pacific Marks.

Even though the majority of the *Sleekcraft* factors are neutral to or weigh against a likelihood-of-confusion finding, the other factors weigh heavily in the Court's analysis. Here, BNSF held longstanding, incontestable marks, which Float Alaska knew were protected under the Lanham Act. Despite receiving a denial from the USPTO for its trademark registration applications and from BNSF for consent to use the marks, Float Alaska nonetheless proceeded under the Northern Pacific name and displayed multiple images of trains on its website, an apparent attempt to capitalize on the established goodwill of the senior mark.[8] (Schwartz Decl. Ex. 29.) When viewing Float Alaska's placement of identical Northern Pacific Marks in this context, even an especially discerning consumer of airline travel or rail freight transport would be reasonable to assume that BNSF has expanded into the

---

[8] Even if, as counsel argued at the hearing, these aerial photographs were not intended to evoke Northern Pacific Railways, such use is too uncanny given Float Alaska's prior knowledge of BNSF's rights in the Northern Pacific Marks.

commercial airline business under the Northern Pacific Marks. Thus, the Court finds that the totality of the facts favors a finding that BNSF is likely to succeed on the likelihood-of-confusion element of trademark infringement.

In sum, the Court determines that BNSF is likely to succeed on its Lanham Act claim, so this *Winter* factor favors an award of injunctive relief.

### B.   Irreparable Harm

To succeed on a motion for injunctive relief, the plaintiff "must establish that irreparable harm is *likely*, not just possible." *Cottrell*, 632 F.3d at 1131. Harm is typically irreparable where "remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). A plaintiff who establishes a likelihood of success on the merits is "entitled to a rebuttable presumption of irreparable harm." 15 U.S.C. § 1116(a).

Because BNSF has proven a likelihood of success on the merits, it is Float Alaska's burden to rebut the presumption of—and to disprove—irreparable harm: here, reputational injury due to negative airline service experiences. (Mot. 18.) To that end, Float Alaska first argues that BNSF has failed to prove that it will suffer reputational injury from Float Alaska's use of the Northern Pacific Marks. (Opp'n 7–10.) The Court dispenses with that contention, as it is Float Alaska's burden to disprove irreparable harm in the first instance. Float Alaska also fails to proffer any evidence why it, a start-up airline with apparently little experience in an industry often plagued by delays and cancellations, (Schwartz Decl. Exs. 30–31), will not be subject to such service failures, (*see* Opp'n 7–10). Further, there is no evidence or meaningful argument why consumers would not apply bad will from Float Alaska's airline operations to BNSF's railroad operations. (*Id.*) Contrary to Float Alaska's position, (*id.* at 8–9), that the #NorthernPacific hashtag is not exclusive to BNSF only increases the risk of irreparable harm, as negative sentiments intended towards Float Alaska can nonetheless proliferate on social media against BNSF outside the control of either company.

Float Alaska also points to BNSF's roughly 12-month delay in bringing this motion, "despite actual knowledge of Float Alaska's trademarks and intended services." (*Id.* at 10.) Certainly, a "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Trib., Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985). Here, however, much of the

delay could be explained by Float Alaska's own litigation conduct. The case was initially filed in the Northern District of Texas in October 2022. (Compl., ECF No. 1.) Despite being served with a summons, Float Alaska failed to respond, prompting Judge Mark Pittman to order BNSF to seek entry of default or to move for default judgment. (Order Re: Default, ECF No. 8.) Float Alaska then requested an extension of time to respond to the complaint, which Judge Pittman granted. (Mot. for Extension, ECF No. 10; Order Granting Extension, ECF No. 11.) Float Alaska then filed a Rule 12(b)(2) motion in December 2022, upon which Judge Pittman ordered the case to be transferred to this Court. (Float Alaska Rule 12(b)(2) Mot., ECF No. 13; Order Re: Transfer, ECF No. 31.) The transfer occurred in May 2023, and BNSF moved for a preliminary injunction less than two months later in July 2023. Filing the instant motion while Float Alaska's Rule 12(b)(2) motion was pending was unlikely to be prudent given the prospect of dismissal or transfer. Thus, any delay is explained by Float Alaska's own conduct, rather than any lack of urgency by BNSF.

Based on the above, the Court finds that Float Alaska has failed to carry its burden of rebutting the presumption of irreparable harm. This *Winter* factor weighs in favor of granting a preliminary injunction.

### C.     Balance of Equities

When deciding whether to grant a preliminary injunction, "a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987); *accord Moroccanoil, Inc.*, 230 F. Supp. 3d at 1178.

The balance of the equities likewise favors BNSF, who argues that the equities favor the grant of injunctive relief because Float Alaska "is just starting operations and could more easily rebrand from the outset of its business." (Mot. 18–19.) In response, Float Alaska rests its entire argument on the unlikelihood of confusion, (Opp'n 23–24), yet the Court has already found that consumers are likely to confuse BNSF's and Float Alaska's use of the Northern Pacific name.[9] In any event, the Court agrees with BNSF, as Float Alaska can more easily pivot due to its relatively young age as a company. Further, given the likelihood of irreparable harm to its reputation and to the goodwill the Northern Pacific Marks has accumulated over

---

[9] The lack of any additional argument is deemed a concession to BNSF's position. *John-Charles*, 646 F.3d 1247 n.4; *City of Arcadia*, 265 F. Supp. 2d at 1154 n.16.

many decades, BNSF stands to suffer far greater harm should Float Alaska proceed with operations under the confusingly similar marks. Thus, the balance of equities favors granting a preliminary injunction.

### D. Public Interest

"The public interest favors a preliminary injunction where, as here, the plaintiff has shown a likelihood of confusion." *Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*, 741 F. Supp. 2d 1165, 1183 (C.D. Cal. 2010). The above analysis shows there is a likelihood of confusion and, as such, there is a public interest in entering a preliminary injunction against Float Alaska to prevent any confusion.

In sum, BNSF is entitled to a preliminary injunction because each of the *Winter* factors weighs in its favor.

### E. Bond

Under Federal Rule of Civil Procedure 65(c), "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." District courts have "wide discretion in setting the amount of a security bond." *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 733 (9th Cir. 1999).

"BNSF suggests a bond of not more than $10,000," (Mot. 19–20), whereas "Float Alaska requests a bond in the amount of two million dollars," (Opp'n 25). BNSF argues that no bond, or at least a relatively low-value one, is appropriate given that Float Alaska "has not yet launched its business operations." (Mot. 19.) However, "[a]s of July 14, 2023, Float Alaska has begun regular scheduled flight service" under its Northern Pacific Marks. (Hsieh Decl. ¶¶ 7, 9.) According to Float Alaska, a preliminary injunction would require at least six months of rebranding and non-operation, resulting in over $1.5 million in costs and an inability to generate any revenue in the interim. (*Id.* ¶¶ 10–12.) BNSF counters that because Float Alaska had actual and constructive notice of BNSF's trademark registrations, any costs associated with adhering to the Court's preliminary injunction "are of [Float Alaska's] own making." (Reply 10–11.)

The Court agrees that a bond of $2 million exceeds what is appropriate. Although some courts have found it appropriate to "err on the high side," *Mead*

*Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000), *accord Chartwell Staffing Servs. Inc. v. Atl. Sols. Grp. Inc.*, No. 8:19-cv-00642-JLS-JDE, 2019 WL 2610975, at *3 (C.D. Cal. May 28, 2019); *Signal Hill Serv., Inc. v. Macquarie Bank Ltd.*, No. CV 11–01539 MMM (JEMx), 2011 WL 13220305, at *24 (C.D. Cal. Jun 29, 2011), Float Alaska proffered no corroborating proof beyond a declaration of its president estimating the costs required to repaint its aircraft, update its website, or create new promotional materials, (Opp'n 25 (citing Hsieh Decl. ¶¶ 7–8, 10–11)). Further, the Court finds a diminished need to protect Float Alaska's financial interests, *see Garrett v. City of Escondido*, 465 F. Supp. 2d 1043, 1059 (S.D. Cal. 2006) ("Generally, the bond amount should be sufficient 'to protect his adversary from loss in the event that future proceedings prove that the injunction issued wrongfully.'" (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 649 (1982) (Stevens, J., concurring in part and concurring in judgment))), given BNSF's likelihood of succeeding on the merits and the high bar of proving Float Alaska's affirmative defenses, *Hokto Kinoko*, 738 F.3d at 1097 (stating that the proponent of fraud "bears a heavy burden of demonstrating that a trademark should be cancelled"); *Prudential Ins.*, 694 F.2d at 1156 (stating that abandonment "must be strictly proved"). Accordingly, the Court sets the bond amount at $500,000, the apparent loss of revenue incurred from ceased operations.[10] (*Compare* Opp'n 25 (requesting a bond of $2 million to cover costs and lost revenue), *with* Hsieh Decl. ¶¶ 11–23 (estimating costs of $1.5 million without reference to lost revenue).)

## IV.   CONCLUSION

BNSF's motion for a preliminary injunction is granted. BNSF is ordered to post bond in the amount of $500,000, upon which Float Alaska shall cease using, pending the resolution of all claims, the marks associated with the following

/ / /

---

[10] Nothing in this order prevents Float Alaska from seeking leave later in the case for a modification of the bond amount upon a showing of "a significant change in facts or law," *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000), including changes supporting its affirmative defenses, case-in-chief, or increased rebranding costs. *But see A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1028 (9th Cir. 2001) (expressing reluctance to "*dramatically* raise bond amounts" (emphasis added)).

trademark application serial numbers: 90/773,348; 90/773,356; 90/773,359; 90/773,349; and 90/773,351.[11]

**IT IS SO ORDERED.**

cc:  Fiscal Department

---

[11] While BNSF also seeks an order restraining Float Alaska from using "any other mark that is confusingly similar [to the Northern Pacific Marks] pending trial of this cause[,]" (Proposed Order 1, ECF No. 65-55), the scope of the requested injunction is overbroad because the Court's analysis is limited only to the likelihood of confusion between the marks actually proffered. Further, the Court expressly leaves open the possibility of lifting the preliminary injunction upon pretrial resolution of this action.